J-A03041-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| BANK OF NEW YORK MELLON TRUST COMPANY, N.A. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| MARK AND LISA BUTTERLINE, LIBERTY MUTUAL INSURANCE CO. A/S/O MIKAL & STEPHEN BENCZE AND MIKAL & STEPHEN BENCZE | |
| Appellees | No. 2690 EDA 2017 |

Appeal from the Order Entered August 11, 2017
in the Court of Common Pleas of Philadelphia County
Civil Division at No.: 150901529

| | |
|---|---|
| MIKAL AND STEPHEN BENCZE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| LIBERTY MUTUAL INSURANCE CO. AND THE BANK OF NEW YORK MELLON | |
| APPEAL OF: THE BANK OF NEW YORK MELLON | |
| | No. 2691 EDA 2017 |

Appeal from the Order Entered August 11, 2017
in the Court of Common Pleas of Philadelphia County
Civil Division at No.: 141003255

J-A03041-18

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE CO. A/S/O MIKAL AND STEPHEN BENCZE, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| THE BANK OF NEW YORK MELLON CORP., | |
| Appellant | No. 2692 EDA 2017 |

Appeal from the Order Entered August 15, 2017
in the Court of Common Pleas of Philadelphia County
Civil Division at No.: 141001662

BEFORE:  GANTMAN, P.J., McLAUGHLIN, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED AUGUST 29, 2018**

In these consolidated cases, Appellant, the Bank of New York Mellon Corp., (Mellon), appeals from the orders entering judgment on August 11 and August 15, 2017, confirming the order of May 3, 2017, against it and in favor of Appellees Mikal and Stephen Bencze (the Benczes), Liberty Mutual Insurance Company (Liberty Mutual, or Liberty), and Mark and Lisa Butterline (the Butterlines), after the trial court denied reconsideration.  The suits address responsibility for the repair of property damage following a hurricane. We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

We take the underlying facts and procedural history in this matter from the trial court's May 3, 2017, August 11, 2017, and October 3, 2017 opinions, as well as our independent review of the certified record.

These consolidated actions concern property damage to the home of the Benczes at 2715 E. Huntingdon Street (Bencze Property) in Philadelphia. The damage occurred during Superstorm Sandy when the wall of the adjacent property, 2713 E. Huntingdon Street (the 2713 Property), fell onto the roof of the Bencze Property. Appellees brought legal actions, complaining that Mellon, as owner, did not repair the 2713 Property. Mellon maintains that it had no legal obligation to do so.

The Benczes sued Mellon, as owner of the 2713 property, for both equitable and monetary relief.[1] Liberty Mutual filed a separate action against Mellon for subrogation. Mellon filed a third action against the Butterlines, the previous owners of the 2713 Property, for trespass and contribution. The trial court consolidated these three actions for a bench trial. Following trial, the trial court found in favor of the Benczes and Butterlines and against Mellon.

The Benczes purchased their home in July of 2009. The house is a two-story row home with a flat roof. The 2713 Property is a three-story row home with a flat roof. The properties are semi-detached at the first level, with the

_____

[1] The Benczes also sued their homeowner's insurance carrier, Liberty Mutual, for breach of contract. The trial court severed the claim to be resolved by a separate trial.

- 3 -

first floor wall separated by a narrow alleyway. The properties share a party wall at the second floor level. The 2713 Property has a third floor, which rises above the Bencze property and overlooks its roof. Both properties have a basement. The record is unclear as to whether the basements share a subterranean party wall.

Prior to the fall of 2007, the Butterlines defaulted on their mortgage. Mellon commenced a foreclosure action against them in November, 2007. Following entry of judgment against the Butterlines, Mellon purchased the 2713 Property at sheriff sale on November 1, 2011. The Sheriff Deed transferred the 2713 Property to Mellon on July 23, 2012. Mellon recorded it on October 31, 2012.

As noted, during Superstorm Sandy in October of 2012, portions of the 2713 Property's third floor wall fell onto the Bencze Property's roof. The trial court credited the Benczes' testimony about the damage this caused, including at least five puncture holes in their roof. The falling debris also caused the flashing on the 2713 Property's third floor wall to separate, allowing debris to fall between the properties. The Benczes produced photographic evidence to support these contentions.

The Benczes took immediate action, including submitting a claim to Liberty Mutual,[2] cleaning the debris, and placing a tarpaulin over part of the

_____

[2] Liberty Mutual inspected the Bencze Property, tarped the puncture holes and made two payments to the Benczes in November and December 2012.

- 4 -

roof. Soon after the storm, in November 2012, water from the 2713 Property began leaking into the Bencze Property, causing water stains and bubbles in the portions of the Bencze Property adjacent to the damaged areas of the 2713 Property. While the Benczes attempted to have the property repaired, any attempts were unsuccessful because of the unrepaired damage to the 2713 Property. The Benczes continually contacted Mellon and its mortgage servicer by telephone and e-mail in an attempt to have the 2713 Property repaired. The evidence at trial, credited by the trial court, demonstrated that throughout a two-year period Mellon assured the Benczes that it would repair the 2713 Property but did not do so.

The Bencze Property continued to sustain ongoing damage, particularly water damage after rain and snow. The basement became wet and the house began to smell. Additional parts of the 2713 Property's third floor wall fell onto the Bencze Property Roof in July 2013.

Further damage occurred in January 2014, when a flood took place in the 2713 Property. After the flood, the Benczes promptly notified Altisource, Mellon's property manager. However, it took no action for nineteen days, allowing the water to leak into the Bencze property basement. As there continued to be on-going water damage every time it rained or snowed, the Benczes noticed the presence of mold in their property, causing illness to both themselves and their pets. At trial, the Benczes provided photographic and video evidence of the continuing damage to their property. There had been

no problems with water damage or mold prior to Superstorm Sandy. The Benczes had not made any property claims prior to Superstorm Sandy.

At the time of Superstorm Sandy, the Butterlines still occupied the 2713 Property. Mellon filed an ejectment action against them in November 2012, and Mellon was granted possession in October 2013. It had the Butterlines removed from the 2713 Property on January 31, 2014. Following the ejectment of the Butterlines, squatters occupied the 2713 Property. The trial court credited the Benczes testimony regarding their calls to the police and their attempts to notify Mellon that the 2713 Property was not secured.

In September 2014, Mr. Butterline observed that the door to the 2713 Property was wide open. The property showed evidence of water and other damages; despite this, the Butterlines again took possession of the property, restored the utilities, and made other repairs to the property. The trial court credited Mr. Butterline's testimony that he did not enter the property between January and September 2014, and did not cause any damage to it.

Because of Mellon's failure to repair the 2713 Property, the Benczes attempted to remediate the damages themselves. Dirk Voories, of ABD Construction, who testified as an expert at trial, was present during attempts to repair the third floor wall of the 2713 Property. He also examined repairs made to the Bencze Property and found them to be sound.

Unfortunately, the Benczes were unable to remediate the mold damages because water continued to infiltrate their property whenever it rained. In

September 2014, the Benczes relocated because of health concerns, which they believed were caused by mold. The trial court credited Mr. Bencze's testimony that in May 2015, he stayed overnight in the Bencze Property and became ill.

As noted, the Benczes sought injunctive relief against Mellon. In December 2014, the trial court entered an order which would again allow ejectment of the Butterlines, and which required Mellon to begin repairs and maintain the 2713 Property within ten days of gaining possession. Mellon obtained possession on February 5, 2015, but did not comply with the order.

At trial, Mellon argued that it had a policy of not entering occupied properties. However, the trial court found that Mellon made no attempts between November 2012 and 2015, even during the periods that the 2713 Property was unoccupied, to repair it. The trial court further held that Mellon had access to the exterior of the 2713 Property at all times and neither Mellon nor its agents tried to contact either the Butterlines or Benczes in order to gain access to either property. The court noted that Mellon did not seek emergency legal relief to request access to property, and did not make any timely attempt to repair the property after gaining possession in February 2015. In sum, the court determined that Mellon did not make any attempts to repair the 2713 Property until January 2016.

Pursuant to a court order, the parties undertook a joint inspection of the properties on August 20, 2015. Among those present were the Benczes, their

expert Mr. Voories, and Mark Childs, who was a field service manager for Altisource. Both Mr. Voories and Mr. Childs wrote reports which were admitted into evidence at trial. However, despite being granted access, Mr. Childs, unlike Mrs. Bencze and Mr. Voories, did not inspect the Bencze Property roof.

At trial, Mellon maintained the position it adopted throughout the litigation, that it was not legally responsible for the condition of the 2713 Property until it obtained actual possession. In the alternative, Mellon also argued that much, if not all, of the water damage to the Bencze Property was caused by a faulty downspout and tear in the Bencze Property roof. Mr. Voories disputed this claim, and Mr. Childs' reports generated at the time did not reflect any concerns about the Bencze Roof downspout. Mr. Voories, testifying as an expert with a reasonable degree of certainty, concluded that water was coming from the 2713 Property and damaging the Bencze Property.[3] He made additional inspections of the Bencze Property and did not find that their downspout was faulty.[4]

Mellon attempted to qualify Mr. Childs as an expert but the trial court declined. The trial court did permit Mr. Childs to testify as a fact witness. In

_____

[3] The trial court noted that Mr. Voories' report used less certain language but ultimately found that the report was not inconsistent with the trial testimony because it was not created in anticipation of litigation and not written as a legal document.

[4] In April 2016, Mr. Bencze installed foam around the base of his downspout to ensure that it did not became loose from the drainpipe.

his report, written after the joint inspection, Mr. Childs could not state with certainty whether any damage occurred between the first and second ejectments of the Butterlines.

Mr. Childs did not address whether water infiltration from the 2713 Property caused damage to the Bencze Property during other periods. Mr. Childs was also unfamiliar with property conditions prior to 2013. Despite making three further visits to the property, he never inspected the Bencze Property roof. Mr. Childs did take a photo that he claimed showed a tear in the Bencze Property roof, but that photo was taken from the roof of the 2713 Property, and, again, Mr. Childs did not mention the alleged tear in his written reports. While those reports reflect Mr. Childs' observation that moisture readings he took at the Bencze Property were greater around the area of the Bencze downspout, the report did not reflect his claim at trial that the downspout was disconnected from the drainpipe.

The Bencze's civil and mechanical engineer, Edward Pridgen, also inspected both properties and testified as an expert at trial. Like Mr. Voories, he determined that the damage to the Bencze Property, including the water damage, was caused by the damage to the 2713 Property's wall and roof. Mr. Pridgen testified that the 2713 Property's roof needed to be replaced. Mr. Pridgen reviewed Mr. Childs' photo of an alleged tear in the Bencze roof but did not see anything in the photo that caused him concern. He did note damage to the Bencze downspout but found it to be both properly installed

and intact. His opinions that the damage to the 2713 property was causing damage to the Bencze Property were based upon a reasonable degree of certainty given his experience and knowledge in construction.

A non-jury trial in these matters took place on September 28, November 8, and November 15, 2016. On May 3, 2017, the trial court issued an opinion finding in favor of Liberty Mutual, the Benczes and the Butterlines. On May 12, 2017, Mellon filed post-trial motions. On June 2, 2017, the Benczes and Liberty Mutual filed a motion for delay damages. On August 11, 2017, the trial court denied Mellon's motion for post-trial relief, granted the Benczes' motion for delay damages, and denied Liberty Mutual's motion for delay damages. On August 15, 2017, the parties praeciped for entry of judgment. The instant, timely appeal followed.[5]

On appeal, Mellon raises the following questions for our review.

> 1. Whether the trial [court] erred as a matter of law in imposing liability on [Mellon] for damages allegedly arising prior to [Mellon's] acquiring actual possession of the [2713 Property?]

> 2. Whether the trial [court] erred in imposing liability on [Mellon] and awarding damages to the Benczes and Liberty[] when neither plaintiff proved proximate causation or damages by a preponderance of the evidence[?] This issue includes, but is not limited to, the following specific points:

---

[5] In response to the trial court's August 25, 2017 order, Mellon filed a statement of errors complained of on appeal on September 6, 2017. **See** Pa.R.A.P. 1925(b). The trial court filed an opinion on October 3, 2017. **See** Pa.R.A.P. 1925(a).

a.    Whether the trial [court] erred in relying on an unqualified expert to reach [its] determinations regarding water and mold damage[?]

b.    Whether the trial [court] erred in reaching [its] determinations regarding water and mold damage without objective evidence including, without limitation, moisture samples or mold analysis[?]

3.    Whether the trial [court] erred in imposing liability on [Mellon] and awarding damages on the Benczes' and [Liberty's] claim for water damage because the Benczes and Liberty[] failed to sustain their burden of proving that any water damage was the legal or proximate result of the condition of the [2713 Property?]

4.    Whether the trial court erred in refusing to qualify Mark Childs as an expert witness causing prejudice to [Mellon] by, among other things, precluding admission of a report by a mold expert and the written report and analysis of mold spore samples by an independent laboratory[?]

5.    Whether the trial court erred in refusing to award [Mellon] damages or contribution against [the Butterlines?]

(Mellon's Brief, at 4-5).[6]

In its first claim, Mellon argues that it "had no legal duty or obligation to make repairs to the [2713] Property prior to [its] acquiring actual possession of the [property]." (***Id.*** at 19; ***see also id.*** at 19-31).

---

[6] Mellon's argument section does not match its statement of the question involved. (***See*** Mellon's Brief, at 4-5, 18–49); ***see also*** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued[.]"). Nonetheless, we will address its issues to the extent that we can determine them, because this discrepancy does not hamper our review. ***See Donahue v. Fed. Express Corp.***, 753 A.2d 238, 241 n.3 (Pa. Super. 2000).

Initially, we note that this inquiry involves a pure question of law. Accordingly, our standard of review is *de novo* and our scope of review is plenary. ***See Liberty Mut. Ins. Co. v. Domtar Paper Co.***, 113 A.3d 1230, 1234 (Pa. 2015) (standard of review as *de novo* and scope of review as plenary for pure questions of law).

After a thorough review of the record, the parties' briefs, the applicable law, and the well-reasoned opinion of the trial court, we conclude that there is no merit to this issue. The trial court opinion properly disposes of this question. (***See*** Trial Court Opinion, 5/03/17, at 19-22) (finding that: (1) Mellon owned 2713 Property at time of Superstorm Sandy; (2) Mellon had duty to use and maintain property in manner that did not harm adjoining landowners; (3) Mellon's reliance on ***Zisman v. City of Duquesne***, 18 A.2d 95 (Pa. Super. 1941), is misplaced; (4) once Mellon foreclosed on 2713 Property there was no longer mortgagee/mortgagor relationship between it and Buttlerines; (5) Mellon was lawful owner of property as of date of sheriff's sale; (6) Mellon was not landlord out of possession; (7) Mellon took no action to remediate or cure conditions that caused damage to Bencze Property; and (8) Mellon breached its duty and was negligent for failing to repair 2713 Property).

We agree with the trial court that when Mellon purchased the property at sheriff's sale in 2011, it assumed all risks associated with the property. ***CSS Corp. v. Sheriff of Chester Cnty.***, 507 A.2d 870, 872 (Pa. Super.

1986), *appeal denied*, 522 A.2d 559 (Pa. 1987) ("A sheriff's sale is made without warranty; the purchaser takes all the risk, and the rule of *caveat emptor* applies in all its force."). (citations omitted). Mellon cannot now avoid this fact and attempt to equate itself with a mortgagee or landlord out-of-possession. It received all rights, title and interest in the property at the time of purchase and must now assume the responsibility that comes with that ownership. **See id.** Accordingly, we reject Mellon's first issue on the basis of the trial court's opinion.

In its second and third issues, Mellon challenges the sufficiency of the evidence, claiming that the Benczes and Liberty Mutual failed to prove that any of its negligence caused any of the damages. (**See** Mellon's Brief, at 31-41).

Specifically, Mellon complains that: (1) the Benczes "did not offer competent evidence that any 'post-acquisition' damages were caused by [its] negligence" (**id.** at 33); (2) "[t]he only competent evidence regarding the cause of 'post-acquisition' damages disproved [the Benczes'] theory and their experts['] unsupported opinions" (**id.** at 37); and (3) the testimony of Mellon witness Mark Childs "highlighted [the Benczes'] failure to meet their burden of proof[.]" (**Id.** at 39). We disagree.

We apply the following standard of review to a nonjury trial verdict:

> Our appellate role in cases arising from nonjury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact

of the trial judge must be given the same weight and effect on appeal as the verdict of the jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co.*, 53 A.3d 53, 60–61 (Pa. Super. 2012), *appeal denied*, 69 A.3d 599 (Pa. 2013) (citation and quotation marks omitted; brackets and ellipses in original). The trial court, as the finder of fact, is free to "believe all, part or none of the evidence presented." *Ruthrauff, Inc. v. Ravin, Inc.*, 914 A.2d 880, 888 (Pa. Super. 2006), *appeal denied*, 962 A.2d 1197 (Pa. 2008) (citation omitted). "Issues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determination or substitute our judgment for that of the factfinder." *Id.* (citation and internal quotation marks omitted).

Initially, Mellon's argument disregards our standard of review, which requires that we view the evidence in the light most favorable to the Benczes as verdict winner. Mellon only discusses the evidence in the light most favorable to itself and ignores all other evidence. (*See* Mellon's Brief, at 33-41). It argues that the trial court erred in crediting the Benczes' expert witnesses and not crediting their fact witness, Mark Childs. (*See id.*). Mellon

overlooks that this Court does not re-weigh the evidence, nor do we engage in credibility determinations.

Moreover, to the extent that Mellon argues that the trial court erred in qualifying the Benczes' expert witnesses or in not sustaining its objections to their testimony, (***see id.*** at 35-36), these contentions are not properly before us, because Mellon did not raise them in its statement of the questions involved. (***See*** Mellon's Brief at 4-5); ***see also Southcentral Employment Corp. v. Birmingham Fire Ins. Co. of Pa.***, 926 A.2d 977, 983 n.5 (Pa. Super. 2007) (holding that issues not explicitly raised in statement of questions involved are waived); Pa.R.A.P. 2116(a). Lastly, Mellon fails to cite to any relevant legal authority in support of its propositions. (***See*** Mellon's Brief, at 33-41). However, while this Court could find that Mellon's failure to argue this issue properly results in waiver, we decline to do so.

We observe that the trial court issued a thoughtful, comprehensive decision that consisted of approximately eighteen pages of detailed findings of fact, accompanied by citations to the record supporting each of its findings. (***See*** Trial Ct. Op., 5/03/17, at 1-18). The court explained which testimony it found credible and why. (***See id.***). In particular, it noted the lack of any problems with the Bencze Property prior to Superstorm Sandy. (***See id.*** at 9). The trial court credited the testimony of the Benczes' expert, Edward Pridgen, that there were no problems with either the Benczes' roof or their downspout. (***See id.*** at 17).

With respect to Mellon's claims that the trial court did not properly credit the testimony of its witness, our review of the record confirms that Mark Childs did not personally view the Bencze Property until August 2015, nearly three years after the first damage to the Property. (*See id.* at 13-15). The trial court noted that, during that first inspection on August 20, 2015, while the Benczes' expert, Mr. Voories, inspected the Bencze roof, Mr. Childs did not. (*See id.* at 14). The trial court particularly pointed out the discrepancies between Mr. Childs' contemporaneous notes and reports regarding his three visits to the two properties and his testimony at trial. (*See id.* at 14, 16-17). Thus, the trial court properly explained its reasoning for the weight it gave to Mr. Childs' testimony.

The trial court also explained that Mr. Voories did not create his report in anticipation of litigation and did not write it as a legal document. (*See id.* at 15). It stated, however, that Mr. Voories did testify at trial "based upon a reasonable degree of certainty as a result of his experience, knowledge, and expertise in construction." (*Id.*) (record citation omitted). Because he did not create his report in anticipation of litigation, the trial court "[did] not find the report to be inconsistent" with his trial testimony. (*Id.*). We have reviewed the record and find no basis to disturb this determination. (*See* N.T. Trial, 9/28/16, at 175, 181-86).

Thus, our review shows that the trial court made thorough and well-supported findings of fact that demonstrated that the Benczes presented

competent evidence that Mellon caused the damage to their property by its failure to repair the 2713 Property. (**See** Trial Ct. Op., at 5/03/17, at 1-18). Moreover, the trial court discussed why it credited the testimony of the Benczes and their expert witnesses and explained its reservations regarding the testimony of Mr. Childs. (**See id.**). We have no basis to disturb these credibility findings. **See Ruthrauff**, **supra** at 888. Mellon's second and third issues are without merit.

In its fourth issue, Mellon complains that the trial court erred and abused its discretion when it refused to qualify Mark Childs as an expert witness.[7] (**See** Mellon's Brief, at 42-46). We disagree.

Pennsylvania Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. Further,

---

[7] The trial court did permit Mr. Childs to testify as a fact witness. (**See** N.T. Trial, 11/15/16, at 9-10).

> [d]etermining whether a witness may testify as an expert is a matter within the sound discretion of the trial court, whose decision will only be reversed for a clear abuse of discretion.  In order to qualify as an expert in a given field, a witness must possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience.  The test to be applied when qualifying a witness to testify as an expert witness is whether the witness has **any reasonable pretension to specialized knowledge on the subject under investigation.**  If a witness possesses neither experience nor education in the subject matter under investigation, the witness should be found not to qualify as an expert.

*Yacoub v. Lehigh Valley Med. Assoc., P.C.*, 805 A.2d 579, 591 (Pa. Super. 2002) (*en banc*), *appeal denied*, 825 A.2d 639 (Pa. 2003) (citations and quotation marks omitted; emphasis in original).

Here, Mellon attempted to offer Mr. Childs as an expert witness in property preservation.  (*See* N.T. Trial, 11/15/16, at 5-10).  Mr. Childs testified that he worked as a regional field services manager for Altisource Solutions, the company that Mellon hired to provide property preservation for mortgage servicing companies.  (*See id.* at 5).

However, our review of the record demonstrates that Mellon failed to establish that Mr. Childs, as a field service manager, had any specialized knowledge, experience, skills, training or education about the mold, construction, and water damage problems at issue.  Mr. Child's *curriculum vitae* is not included in the certified record and he did not testify that he had any licensing, training, or education in the fields of mold, water damage, or construction.  (*See id.* at 5-8).

Moreover, his work experience was supervisory and concerned with workflow rather than hands-on work in construction or preservation; he testified that his job was to "oversee the vendors that are contracted by Altisource to do the property preservation work and to make sure that work gets done." (*Id.* at 5). He further testified that his work for his previous employer was identical. (*See id.* at 6). He did not testify that he had any specialized knowledge, skill, or expertise with respect to actually remediating mold or repairing damaged properties only that he had inspected them as part of his job. (*See id.* at 7-10). Moreover, he admitted to having minimal experiences overseeing properties with water damage. (*See id.* at 7).[8]

In addition, our review of the record confirms the trial court's conclusion that Mellon attempted to qualify Mr. Childs as an expert to provide opinion testimony on an unauthenticated mold report[9] prepared by Amato Field Services, an entirely separate entity. (*See* Trial Ct. Op., 8/11/17, at

---

[8] Further, to the extent that Mellon contends that the trial court disqualified Mr. Childs "because [it] believed he was employed by a party and that was disqualifying[,]" (Mellon's Brief, at 42), this claim is not properly before us. Mellon fails to point to anything in the record that supports this assertion, and candidly concedes that any conversation about this occurred during "off-the-record discussions[.]" (*Id.* at 44). "This Court does not rely on facts *dehors* the certified record." *In Re Estate of Tigue*, 926 A.2d 453, 459 (Pa. Super. 2007) (citation omitted). Accordingly, we will not address this claim.

[9] The report is not included in the certified record and we are unable to ascertain its contents.

unnumbered page 8; *see also* Mellon's Brief, at 45; N.T. Trial, 11/15/16, at 58-59). Amato Field Services based its conclusions on laboratory tests and results by an independent laboratory, EMLab P&K.[10] (*See* Trial Ct. Op., 8/11/17, at unnumbered page 8). Leaving aside the hearsay issues raised, we see nothing in the evidence discussed above which demonstrated that Mr. Childs had the necessary expertise, given his own experience was purely supervisory, to offer his opinion regarding laboratory results or someone else's conclusions on mold remediation.[11] Further, his supervisory experience in overseeing contractors to make sure projects be completed was insufficient to demonstrate any specialized knowledge with respect to the issues in the instant matter. Therefore, we find that the trial court did not abuse its discretion in failing to qualify Mr. Childs as an expert. *See Seels v. Tenet Health Sys., Hahnemann, LLC*, 167 A.3d 190, 204-05 (Pa. Super. 2017) (holding that trial court did not abuse its discretion in refusing to qualify doctor who had general expertise in hospital administrative programs as expert in bloodless medicine where doctor had no specific experience in creating, operating, or supervising bloodless medicine program, no direct knowledge

_____

[10] The trial court offered Mellon the opportunity to bring in someone from either Amato Field Services or the laboratory to testify about the report, so that Mellon could offer it into evidence, but Mellon declined. (*See* N.T. Trial, 11/15/16, at 59).

[11] Again, in the absence of the actual Amato Field Services report, it is not entirely clear on what topics Mellon wanted Mr. Childs to opine.

about using or operating relevant equipment, and no training in correct standard of care). Mellon's fourth claim does not merit relief.

In its final claim, Mellon contends that the trial court erred in granting judgment in favor of the Butterlines on its claims for trespass and contribution. (***See*** Mellon's Brief, at 46-49). We disagree.

Again, we briefly note that our standard of review "is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law." ***Allegheny Energy Supply Co.***, ***supra*** at 60. Under Pennsylvania law, trespass is an unprivileged, intentional intrusion on land in possession of another. ***See Kopka v. Bell Telephone Co.***, 91 A.2d 232, 235 (Pa. 1952). The possessor can sue for damages in the form of both equitable relief and/or monetary damages. ***See Jones v. Wagner***, 624 A.2d 166, 171 (Pa. Super. 1993), *appeal denied*, 637 A.2d 286 (Pa. 1993). Finally, "[a] trespasser on land is subject to liability for bodily harm caused to the possessor . . . by any . . . condition **created by the trespasser** while upon the land[.]" ***Kopka***, ***supra*** at 236 (emphasis added).

Here, Mellon admits that the trial court did find that the Butterlines trespassed. (***See*** Mellon's Brief, at 46; Trial Ct. Op., 5/03/17, at 25). However, it avers that the trial court erred in not awarding damages on this claim. (***See*** Mellon's Brief, at 46). In its brief argument on this issue, Mellon fails to cite to any portion of the record that supports a contention that the

Butterlines damaged the 2713 Property. (*See id.* at 46-49). We have thoroughly reviewed the record and find no instance where any party ascribed any particular damages to the Butterlines.

Moreover, it is not this Court's role to scour the record to find support for Mellon's claims. *See Commonwealth v. Mulholland*, 702 A.2d 1027, 1034 n.5 (Pa. Super. 1997) ("In a record containing thousands of pages, this [C]ourt will not search every page to substantiate a party's incomplete argument.") (citation omitted).

Perhaps because of this lack of record support, Mellon now claims that the Butterlines' illegal occupancy of the 2713 Property itself resulted in damages to Mellon because it prevented access to the property for maintenance and repair. (*See* Mellon's Brief, at 47).

However, Mellon, in a failure to comply with Pennsylvania Rule of Appellate Procedure 2117(c), does not document where it raised this claim with the trial court. On independent review, we have not been able to ascertain where Mellon raised this claim. The trial court does not address it in either its May 3, 2017 opinion or in its decision denying Mellon's post-trial motions. (*See* Trial Ct. Op., 5/03/17, at 25; Trial Ct. Op., 8/11/17, at 39-40). An appellant cannot raise a new theory on appeal; accordingly, we find

Mellon waived this claim.[12] *See Andrews v. Cross Atlantic Capital Partners, Inc.*, 158 A.3d 123, 129 n.10 (Pa. Super. 2017) (*en banc*), *appeal denied*, 172 A.3d 584 (Pa. 2017) ("Because one cannot raise a new legal theory on appeal, this claim is waived."); *see also* Pa.R.A.P. 302(a); Pa.R.A.P. 2117(c); Pa.R.A.P. 2119(e); Pa.R.A.P. 2101.

Mellon also complains that the trial court erred in finding that the Butterlines did not owe contribution as joint tortfeasors. (*See* Mellon's Brief, at 47-48). We disagree.

This Court has defined joint tortfeasors as "two or more persons jointly or severally liable in tort for the same injury to persons or property[.]"

_____

[12] In any event, Mellon does not cite to anything in the record that supports a contention that the Butterlines prevented them from accessing the 2713 Property in order to maintain it and make repairs. Rather, the record reflects that the property maintenance company, Altisource, had an internal policy of not performing "property preservation work" if people were living in the property. (N.T. Trial, 11/15/16, at 15). Further, Mellon does not cite to the record to support a contention that it made any efforts to contact the Butterlines to gain access to the property to make repairs. Moreover, the record reflects the Butterlines were removed from the 2713 Property for the first time in January 2014, and did not reenter the property until September 2014, but Mellon made no effort to undertake repairs to the 2713 Property during that period. (*See id.* at 68). The fact that Mellon failed to maintain the 2713 Property during that approximately ninth-month period is underscored by the fact that the Butterlines were able to retake possession of the 2713 Property in September 2014, because it was unsecured, had been occupied by squatters, and the door was wide open. (*See id.* at 90-92; *see also* N.T. Trial, 9/28/16, at 62, 140; N.T. Trial 11/08/16, at 37, 75). Thus, even if Mellon had not waived the claim, it failed to prove that the Butterlines' occupancy prevented it from maintaining and repairing the 2713 Property.

***Mamalis v. Atlas Van Lines, Inc.***, 528 A.2d 198, 199 (Pa. Super. 1987), *affirmed*, 560 A.2d 1380 (Pa. 1989) (citation omitted).

Here, the trial court found that Mellon was not entitled to contribution because the Benczes did not name the Butterlines as joint tortfeasors and Pennsylvania law only authorizes contribution claims among joint tortfeasors. (***See*** Trial Ct. Op., 5/03/17, at 25). Mellon tacitly acknowledges this, but argues that it is irrelevant whether the Benczes sued the Butterlines as joint tortfeasors so long as they **are** joint tortfeasors. (***See*** Mellon's Brief, at 47-48). However, Mellon provides no caselaw in support of this contention, and merely mis-cites to a statutory definitional section. It fails to develop a supporting argument. It is well settled that failure to argue and to cite any authority supporting the argument constitutes a waiver of the issue on appeal. ***See Jones v. Jones***, 878 A.2d 86, 90 (Pa. Super. 2005). This Court will not act as counsel and will not develop arguments on behalf of an appellant. ***See Bombar v. West Am. Ins. Co.***, 932 A.2d 78, 94 (Pa. Super. 2007). When deficiencies in a brief hinder our ability to conduct meaningful appellate review, we can dismiss the appeal entirely or find certain issues to be waived. ***See*** Pa.R.A.P. 2101. Because Mellon has failed to develop an argument with pertinent support for its claim that it is entitled to contribution from a party not named as a joint tortfeasor, it has waived the claim. ***See id.***; ***Bombar***, ***supra*** at 94; ***Jones***, ***supra*** at 90. Accordingly, we affirm.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/29/18</u>

# IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE. CO. A/S/O MIKAL AND STEPHEN BENCZE | : : : | OCTOBER TERM, 2014 |
| | : | NO. 1662 |
| v. | : : | |
| THE BANK OF NEW YORK MELLON CORP | : | SUPERIOR COURT NO. 2692 EDA 2017 |

| | | |
|---|---|---|
| MIKAL AND STEPHEN BENCZE | : : | OCTOBER TERM, 2014 |
| v. | : : | NO. 3255 |
| LIBERTY MUTUAL INSURANCE CO. and THE BANK OF NEW YORK MELLON | : : | SUPERIOR COURT NO. 2691 EDA 2017 |

| | | |
|---|---|---|
| BANK OF NEW YORK MELLON CO., N.A | : : | SEPTEMBER TERM, 2015 |
| v. | : : | NO. 1529 |
| MARK AND LISA BUTTERLINE | : : | SUPERIOR COURT NO. 2690 EDA 2017 |

## OPINION

The above captioned matters were consolidated for trial. Bank of New York

Mellon ("BNYM") appeals this court's Orders of August 11, 2017, which denied its Post-

Trial Motions and entered judgment. BNYM filed an appeal on each individual case;

Bank Of New York/Mellon Trust Co Vs Butterli-OPFLD



15090152900077

however, as the facts and law of each case are the same, this court submits this Opinion on all three matters.

## **FACTUAL and PROCEDURAL HISTORY**

Stephen and Mikal Bencze filed an action against their insurance carrier Liberty Mutual and the Bank of New York Mellon ("BNYM"), to recover for damage sustained to their home when a wall from the adjacent property collapsed onto their roof (1410-3255). The address of the adjacent property is 2713 E. Huntingdon Street ("2713 Property"). At the time of the collapse and subsequent thereto, the 2713 Property was owned by BNYM, who had acquired title at a Sheriff Sale resulting from a mortgage foreclosure. Subsequently, Liberty filed an action against BNYM for subrogation (1410-3255). BNYM thereafter filed suit against the previous owners of the 2713 Property, Mark and Lisa Butterline ("Butterlines"), for contribution and trespass (1509-1529). These cases were consolidated for trial.

Following a bench trial this court found as follows:

1) *Bencze v. Bank of New York Mellon* (October Term 2014 No. 3255), in favor of the Benczes and against BNYM in the amount of $236,525.76.

2) *Liberty Mutual v. Bank of New York Mellon* (October Term No. 1662), in favor of Liberty and against BNYM in the amount of $27,489.58.

3) *Bank of New York Mellon v. Butterline* (September Term 2015 No. 1529), in favor of BNYM and against the Butterlines, but awarded no damages. As to the claim for contribution, in favor of the Butterlines and against BNYM.

This court issued detailed Findings with its Decision, a copy of which is attached hereto as Exhibit A.

Thereafter BNYM filed for Post-Trial Relief, which raised the following five issues:

(1) The court erred in finding that BNYM became legally responsible for the condition of the 2713 Property before BNYM obtained actual possession.

(2) The court erred in refusing to qualify Mark Childs as an expert witness.

(3) The court erred in finding that the Benczes had proved their damages by a preponderance of the evidence.

(4) The court erred in its assessment of the evidence related to the water damage on the Bencze property.

(5) The court erred In finding that BNYM was not entitled to damages stemming from its trespass claim against the Butterlines.

The court heard oral argument and thereafter denied the Post-Trial Motions and entered judgment consistent with its original findings. This court issued an Opinion with its decision, which addressed the five issues raised. The Opinion is attached as Exhibit B. Additionally, this court granted Benczes' Motion for Delay Damages and awarded $15,586.40 in delay damages. The Motion for Delay Damages filed by Liberty was denied.

BNYM filed timely appeals. In response to this court's 1925(b) Order, BNYM filed a Statement of Matters Complained. The issues raised therein are the same as those raised in the Post Trial Motions.

## DISCUSSION

Pa.R.C.P. 227.1 requires parties to file post trial motions in order to preserve issues on appeal. If an issue has not been raised in a post trial motion, it is waived for appeal purposes. *Diamond Reo Truck Co. v. Mid-Pacific Industries*, 806 A.2d 423, 428 (Pa. Super. 2002). In that the issues raised by BNYM are the same as those raised in its Post Trial Motion, this court submits its Opinion issued therein (Exhibit B) and its Findings and Decision (Exhibit A) as the basis for its decision in this matter.

BY THE COURT:

IDEE C. FOX, J.

DATE: 10/3/17

# EXHIBIT A

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE. CO. | : | OCTOBER TERM, 2014 |
| A/S/O MIKAL AND STEPHEN BENCZE | : | |
| | : | NO. 1662 |
| v. | : | |
| | : | LEAD CASE |
| THE BANK OF NEW YORK MELLON CORP. | : | |

| | | |
|---|---|---|
| MIKAL AND STEPHEN BENCZE | : | OCTOBER TERM, 2014 |
| | : | |
| v. | : | NO. 3255 |
| | : | |
| LIBERTY MUTUAL INSURANCE CO. and | : | |
| THE BANK OF NEW YORK MELLON | : | |

| | | |
|---|---|---|
| BANK OF NEW YORK MELLON CO., N.A. | : | SEPTEMBER TERM, 2015 |
| | : | |
| v. | : | NO. 1529 |
| | : | |
| MARK AND LISA BUTTERLINE | : | |

## FINDINGS AND DECISION

This consolidated action concerns property damage and untimely repairs to the home of Stephen and Mikal Bencze ("Benczes") located at 2715 E. Huntingdon Street in Philadelphia ("Bencze Property"). The damage initially occurred after the wall of the adjacent property, 2713 E. Huntingdon Street ("2713 Property") partially collapsed and fell onto the roof of the Bencze Property during Superstorm Sandy. Thereafter the wall remained exposed and damage to the wall, roof and flashing was left unrepaired.

The Benczes filed suit against Bank of New York Mellon ("Mellon"), the owner of the 2713 Property for equitable and monetary relief. The claims contained in Counts I and II,

1

Private Nuisance and Trespass, are equitable claims that request the Court to direct Mellon to repair the roof of the 2713 Property. Count III sounds in Negligence and seeks money damages as a result of the property damage to the Bencze Property and Mellon's failure to repair the same. Mellon argues it was not legally responsible for the condition of the 2713 Property until it gained actual possession. Further, Mellon asserts that water damage to the Bencze Property was caused by an allegedly faulty downspout of the Bencze Property and a tear in the roof of the Bencze Property. Count IV is a Breach of Contract claim against the Benczes' homeowner's insurance carrier, Liberty Mutual Insurance Company ("Liberty"), for failing to pay out covered claims[1].

Additionally, Liberty separately filed suit against Mellon for Subrogation. Mellon filed an action against Mark and Lisa Butterline ("Butterlines"), the previous owners of the 2713 Property, for Trespass and Contribution as result of the damage done to the two properties. The three cases were consolidated and this Court conducted a bench trial. Thereafter, the parties submitted proposed findings and conclusions. Based on the testimony and evidence presented at trial, the Court makes the following findings and reaches various conclusions to find in favor of the Benczes and against Mellon, and various other findings as set forth herein.

## FACTS AND PROCEDURAL HISTORY

The Benczes purchased their Property in July 2009 for $155,000.00 (stipulated), NT 11/8/16 p. 71. The Bencze Property is a single family, two story row home with a flat roof. At the time of purchase, the Benczes made certain improvements to the home,

---

[1] The Court severed this claim to resolve by separate trial.

2

including the installation of new windows. NT 9/28/16 p. 56-57., NT 11/8/16 p. 25-26. The Bencze Property is insured under a homeowner's insurance policy with Liberty (stipulated). The adjacent 2713 Property is a single family, three story row home with a flat roof. The Butterlines owned the 2713 Property prior to the Benczes' purchase (stipulated) with a mortgage lien.[2] The front of both properties face south, with the 2713 Property immediately to the west of the Bencze Property.

At the first floor levels, the properties are semi-detached, with the first floor wall separated by a only by alleyway which runs parallel on the side of the two properties. When entering the front door of the Bencze Property, there is a foyer and living room area ("Living Room"). Directly north of the Living Room is a dining room ("Dining Room"). The Living Room and Dining Room are separated by a wall with French doors and a north-facing window to the left of the French doors ("North Living Room Wall"). The Dining Room is narrower than the Living Room and has a west-facing wall perpendicular to the North Living Room Wall ("West Dining Room Wall"). A downspout is located in the exterior corner of the Bencze Property where the North Living Room Wall and West Dining Room Wall meet ("Bencze Downspout"). Next to the Dining Room is the kitchen, which is at the rear of the Bencze Property ("Kitchen").

The properties share a party wall at the second floor level ("Party Wall"). Within the Bencze Property, the master bedroom is on the second floor and south end of the Bencze Property ("Master Bedroom"). The guest bedroom is directly north of the Master Bedroom ("Guest Bedroom"). The Guest Bedroom has a northern wall with a north-facing

---

[2] However, as will be set forth in greater detail, at all times relevant herein the 2713 Property had been foreclosed upon and sold at Sheriff sale to Mellon.

3

window on the left side ("North Guest Bedroom Wall"). The North Guest Bedroom Wall is above the North Dining Room Wall. Beyond the Guest Bedroom is a bathroom and a third room. The Party Wall is located in the Guest and Master Bedrooms. The Guest and Master Bedrooms are directly above the Living Room, with the west Living Room wall under the Party Wall ("West Living Room Wall"). *See generally* Exhibit Mellon 55.

The 2713 Property's third floor rises above the Bencze Property by one story, which results in a one story east-facing exterior wall that overlooks and is perpendicular to the second story flat roof of the Bencze Property ("Third Floor Wall"). This area of the Bencze Property roof that meets the Third Floor Wall is located above the Guest and Master Bedrooms ("Bencze Roof") and is directly above the Party Wall. Lastly, the 2713 Property and Bencze Property each have a basement. It is unclear whether the basements share a subterranean party wall.

Sometime prior to Superstorm Sandy, the Butterlines defaulted under their mortgage and Mellon commenced an action in foreclosure in November 2007 (stipulated) ("Foreclosure Action")[3]. Judgment was entered and the Property went to Sheriff Sale on November 1, 2011. No other bids being made, Mellon purchased the 2713 Property. The Sheriff Deed which transferred the 2713 Property to Mellon, was executed on July 23, 2012 and thereafter recorded on October 31, 2012 (stipulated) ("Mellon Deed"). *See also* Exhibit Mellon-3.

---

[3] *See Bank of New York Trust Co v. Butterlines et al,* C.C.P. November Term, 2007, No. 0509; Exhibit Mellon-2.

4

On October 29, 2012, two days before the Mellon Deed was actually recorded, Superstorm Sandy hit the Philadelphia area (stipulated). During the storm, the stucco and brick from the 2713 Property's Third Floor Wall fell onto and damaged the Bencze property Roof (stipulated). The Benczes credibly testified as to the wall collapse and the subsequent visible exterior damage to their property. The testimony revealed that the falling stucco and brick from the 2713 Property's Third Floor Wall punctured at least five holes in the Bencze Roof, each approximately three to five inches in size. NT 9/28/16 p. 47. The falling debris also caused the flashing, which bordered the 2713 Third Floor Wall and the Bencze roof, to separate from the adjoining 2713 Third Floor Wall. *Id.* The separated flashing created a gaping hole which allowed debris to fall between the properties. NT 9/28/16 p. at 47, 50, NT 11/8/16 p. 28. Photos exhibited the collapsed stucco and the exposed underlying brick work.

The Benczes were home at the time of the incident and heard the stucco fall. NT 11/8/16 p. 28, 73. They first observed the damage from the street. NT 9/28/16 p. 42-44. After the rain stopped, the Benczes went onto the Bencze Roof, cleaned the debris and discovered the puncture holes and ripped flashing. NT 9/28/16 p. 45-47, 50, NT 11/8/16 p. 27, 29. They placed a tarp they had over a portion of the roof. *Id.* at 50. The Benczes took photographs of the damage, which were admitted into evidence at trial. *See* Exhibits P1A-P1K. Water also leaked into the 2713 Property soon after Superstorm Sandy. NT 11/15/16 p. 89.

The Benczes called Liberty on the evening of the storm to report the damage and submit a claim. NT 9/28/16 p. 44, NT 11/8/16 p. 27, 29. Shortly thereafter, Liberty

5

inspected the Bencze Property and tarped the puncture holes. NT 9/28/16 p. 51. After the Benczes paid their $1,000 deductible, Liberty made two payments to the Benczes November 2012 totaling $7,524.76. *Id.*; NT 11/8/16 p. 27; Exhibits Liberty-1, 2 and 4. Liberty made another payment of $200 in December 2012 for the tarp used by the Benczes. Exhibit Liberty-2.

In early November 2012, water started to infiltrate the interior of the Bencze Property. NT 9/28/16 p. 51. Specifically, in the Guest Bedroom there were water stains along the Party Wall and balloon-like bubbles in the ceiling. NT 9/28/16 p. 51, 58, NT 11/8/16 p. 30. This area is directly under the portion of the damaged Bencze Roof and the Third Floor Wall. *Id.*

At first the Benczes tried to have their roof repaired/replaced, but nothing could be done until the damaged Third Floor Wall was fixed. The collapsed stucco exposed the unprotected brick work of the 2713 Property Third Floor Wall. It also compromised the stucco still remaining on the Wall. NT 11/18/16 p. 29-30. The Benczes immediately began to contact different sources to have the 2713 Property repaired, including Mellon's servicer, GMAC Mortgage ("GMAC"). NT 9/28/16 p. 125-126; NT 11/8/16 p. 32. The Benczes contacted GMAC by letter and explained their roof could not be repaired until the 2713 Property's Third Floor Wall was repaired. Exhibit Mellon-32. Mrs. Bencze continuously contacted GMAC and/or Mellon by telephone and email. NT 9/28/16 p. 53-54. In June 2013, the Benczes emailed Mellon's legal department about the disrepair of the 2713 Property and resulting damage to the Bencze Property. Exhibit Mellon-33. Throughout a two year period, Mellon informed the Benczes that it would make the

6

repairs. NT 9/28/16 p. 56, 70-71. In 2013 GMAC sent out structural engineers to inspect the damage, but no repairs were ever made. NT 9/28/16 p. 54-56; NT 11/8/16 p. 32.

Throughout 2013, the interior of the Bencze Property continued to suffer ongoing damage. Specifically, after rain and snow storms the stains on the Party Wall moved across the ceiling of the Guest Bedroom and down the North Guest Bedroom Wall. NT 9/28/16 g. 58; NT 11/8/16 p. 30-31. The North Guest Bedroom Wall started to bubble and break open. NT 9/28/16 p. 58-59; NT 11/8/16 p. 31. An odor developed and the basement became wet. NT 9/28/16 p. 59. Another large section of stucco fell from the Third Floor Wall onto the Bencze Roof in July 2013, further exposing the unprotected and crumbling brickwork of the 2713 Property. NT 11/18/16 p. 28.

The Butterlines occupied the 2713 Property at the time of Superstorm Sandy (stipulated). Mellon filed an ejectment action against the Butterlines in November 2012 (stipulated)[4]. Mellon was granted possession in October 2013 and the Butterlines were removed from the 2713 Property on January 31, 2014 (stipulated) ("First Ejectment").

Mellon hired Altisource in 2013 to oversee the ejectment process and preserve the 2713 Property. NT 11/15/16 p. 16, 66. *See also* Exhibit Mellon-8. Altisource's vendor installed a digital lock on the 2713 Property once the Butterlines were removed. NT 11/15/16 p. 22-23; Exhibit Mellon-8, lines 89-90. Altisource winterized the 2713 Property, which was completed by February 21, 2014. Exhibit Butterline-4; NT 11/15/16 p. 85-86.

---

[4] *See Bank of New York Trust Co v. Butterline et al*, C.C.P. November Term, 2012, No. 2761; Exhibit Mellon-4.

7

In February 2014, a flood occurred in the 2713 Property after being winterized. Mr. Bencze credible testified that as he and his wife returned from dinner, he heard water running. He looked from their rear yard and observed water gushing along the first floor the 2713 Property and apparently flowing in the basement. NT 9/28/16 p. 59-60; NT 11/8/16 p. 37-38. The Benczes called the water department to have the water shut off in the 2713 Property. *Id.* Mrs. Bencze informed Altisource of the flood. *Id.* Nineteen days later, Altisource pumped the water out of the 2713 Property's basement. *Id.* By that time, water had leaked into the Bencze Property's basement. *Id.* This caused further damage to the Bencze Property. NT 11/8/16 p. 38. The Benczes credibly testified that the flooding in their basement occurred at the time of the flood in the 2713 Property.

Through January 2014, the Bencze Property continued to sustain damage which worsened every time it rained or snowed. NT 9/28/16, p. 60-65. Water damage continued in the Guest Bedroom and infiltrated the Living Room walls. NT 11/8/16 p. 39. Water began to drip through the Living Room ceiling and windows in the West Living Room Wall directly below the Party Wall and that Third Floor Wall of the 2713 Property. NT 9/28/16 p. 60-61. Water appeared in the Dining Room, Kitchen and basement. NT 9/28/16 p. 61, 136; NT 11/8/16 p. 39-40. Continuous clean-up was required every time it rained. NT 9/28/16 p. 61. The water damage spread through the house over time. NT 9/28/16 p. 66; NT 11/8/16 p. 31-32. The walls of the basement became discolored and the paint started to peel. NT 9/28/16 p. 67-68.

At some point the Benczes noticed the presence of mold in their Property, which caused the Benczes and their animals to become sick. NT 9/28/16 p. 71; NT 11/8/16 p.

8

40, 44. Mold testing in May 2014 confirmed there was mold in the Bencze Property. NT 9/28/16 p. 71; NT 11/8/16 p. 40. The Benczes paid $825.00 for the mold testing. NT 11/8/16 p. 59; Exhibit P-3. The Benczes took photos and videos of the progressing interior damage to their Property, which were admitted into evidence. *See* Exhibits P1-O though P1-WW and P-2.

Prior to Superstorm Sandy, there was never water infiltration, water stains or mold in the Bencze Property. NT 9/28/16 p. 57-58; NT 11/8/16 p. 34-35. Again, the Benczes made improvements to the their Property when first purchased, including new windows. NT 9/28/16 p. 57-58. The basement was clean and newly painted with no discoloration. *Id.* at 66. The Benczes never made a property claim with respect to the their Property before to this incident. *Id.* at 57; NT 11/8/16 p. 8.

The 2713 Property had been illegally entered and occupied after the First Ejectment. NT 9/28/16 p. 62, 140; NT 11/8/19 p. 37, 75. At times the front door and windows were unsecure and open. NT 11/8/19 p. 37. Mr. Bencze observed people, who were not the Butterlines, going in and out of the 2713 Property and he would often call the police. NT 11/8/16 p. 37, 75. Both Benczes credible testified that each time this happened they notified Mellon and/or its agents. NT 11/8/16 p. 37.

In early September 2014, Mr. Butterline visited the 2713 Property and found the front door wide open. NT 11/15/19 p. 90. Inside there was evidence of squatters, property damage and water damage in the basement. *Id.* at 90-92. The Butterlines then took possession again of the 2713 Property (stipulated). Mr. Butterline secured the 2713 Property, restored the utilities, replaced the sheetrock on the third floor. *Id.* at 91-93.

9

The Butterlines never entered the 2713 Property between the First Ejectment and September 2014. *Id.* at 94. They did not turn on the water or cause any damage to the 2713 Property during that time period. *Id.* The Court finds Mr. Butterline's testimony credible.

As Mellon failed to repair the 2713 Property. The Benczes began to remediate the damage themselves. In the fall of 2014, the Benczes hired a contractor to repair the stucco of the Third Floor Wall to avoid further damage. NT 9/28/16 p. 70-71; NT 11/8/15 p. 41-42, 97-98. At that time the roof of the 2713 Property was in disrepair. NT 9/28/16 p. 154. The contractor did not fix the flashing of the 2713 Property roof because the Benczes had received notice from Mellon that the 2713 Property roof was going to be repaired. NT 9/28/16 p. 150. Dirk Voories of ABD Construction was present during the repairs to the Third Floor Wall. NT 9/28/16 p. 180. He inspected the exterior and interior of the Bencze Property and found the Bencze Roof had been well repaired. NT 9/28/16 p. 180, 188. The Benczes paid $8,000.00 for the repairs. NT 9/28/16 p. 71; NT 11/8/15 p. 42; Exhibit P-3. The Benczes also paid $600.00 for tarping, which Liberty reimbursed in June 2014. Exhibits Liberty-2 and 3.

The Benczes next hired a mold remediation company. The remediation cost was $10,000.00, which was charged to a credit card. NT 9/28/16 p. 72; NT 11/8/16 p. 41; Exhibit P-3. The mold remediation was unsuccessful because it rained during the process and water continued to infiltrate the Party Wall. NT 9/28/16 p. 72; NT 11/8/16 p. 41, 43. The Benczes had a $5,000.00 mold remediation policy that Liberty paid in February 2016. NT 11/8/16 p. 6, 11-12, 16

10

The Benczes relocated in September 2014 (stipulated), due to the health problems they experienced while at their Property. NT 11/8/16 p. 43-44. The Benczes found a small apartment in Malvern that had a short term lease option and allowed animals ("Apartment"). NT 9/28/16 p. 78-79. The rent started at $1,442.00 per month, which included a $42.00 service charge for using a credit card. *Id.* at 77. The rent increased to $1,485.26 in February 2015. Exhibits P-3, 4, and 20. From September 2014 to November 2016, the Benczes paid a total of $7,500.00 for rent and fees by check, and $32,781.60 for rent and a move-in fee by credit card, for a total of $40,281.60. NT 9/28/16 p. 77; NT 11/8/16 p. 49-50; Exhibits P-3, 4, and 20. The Benczes used credit cards because of insufficient liquid funds. NT 11/8/16 p. 50.

The Benczes paid additional costs as a result of this relocation. These include $3,000.00 in travel costs for Mr. Bencze to drive to work; $2,650.56 in PECO energy costs for the Apartment; $2,026.46 in storage fees and $350.00 to winterize their Property. NT 9/28/16 p. 77-78; NT 11/8/16 p. 50-57; Exhibits P-5, 7 and 13. These costs were charged to the Benczes' credit cards, except for the travel fees. Exhibits P-3, 13, and 20. The Benczes also had to dispose of furniture that was destroyed. The replacement furniture expense was $12,361.00. NT 9/28/16 p. 83-84, 119. Justine Penetrante Lowe, qualified by the Court as a CPA, testified concerning the credit card charges and the accrued interest. NT 9/28/16 p. 206. Between August 2014 and May 2016, the Benczes incurred interest in the amount of $3,502.64. NT 9/28/16 p. 209; Exhibit P-13.

On December 23, 2014, pursuant to the Benczes Petition for Injunctive Relief filed under their action against Mellon and Liberty (1410-3255), the Honorable Nina Wright

11

Padilla entered a detailed Order which directed the Prothonotary to issue a Writ of Possession to Mellon to allow the ejectment of the Butterlines ("December 2014 Order"). Exhibit Mellon-6[5]. This Order further required Mellon to retain a contractor to commence work and repair and maintain the 2713 Property within ten days of possession, so as to prevent damage to the Bencze Property. *Id.* Mellon was to complete the necessary repairs as soon as possible and to maintain the 2713 Property. *Id.* It is stipulated that Mellon obtained possession on February 5, 2015.

Despite the Order from Judge Padilla and Mellon's assurances given to the Benczes both before and after the Order, Mellon never really did remediate the problems at the 2713 Property. Further by time Mellon finally began to do some work, the damage had already been done to the Bencze Property. NT 9/28/16 p. 70; NT 11/8/16 p. 36, 41; NT 11/15/16 p. 67-68. Between the time of the storm and 2015, Mellon never made any attempt to repair the damaged 2713 Property. Mellon had access to the exterior of the Property and therefore had the ability to make the repairs to the Third Floor Wall, the party wall flashing, and the 2713 Property roof. Neither Mellon, its servicing agents, nor its designated property maintenance agents contacted the Butterlines to enter the 2713 Property, nor contacted the Benczes to access the Bencze Property to make or even attempt repairs. There was one uneventful visit by the engineers in 2013. NT 9/28/16 p. 150; NT 11/15/16 p. 78-79, 94-95. Mellon had a policy not to enter occupied properties. NT 11/15/16 p. 20, 86. However, Mellon as owner of the 2713 Property never sought

---

[5] In January 2015 Mellon had filed a second ejectment action against the Butterlines *Bank of New York v. Butterline, et al. CCP January Term* 2015. This became moot as a result of Judge Padilla's Order

12

emergency or injunctive relief to request access to inspect and/or make repairs. Neither the Benczes nor the Butterlines interfered with Mellon's ability to remediate the damage. Mellon also did not make a timely attempt to repair or maintain the 2713 Property after having actual possession in early February 2015. Mellon claims that in February 2015 Altisource contacted the Butterlines and Benczes to gain access to the properties by leaving notes in their mailboxes. NT 11/15/16 p. 32. However, at that time the Butterlines and the Benczes were no longer in their properties. Altisource did not make any phone calls to gain access to the Bencze Property. NT 11/15/16 p. 79. Also, in late February 2015 Altisource generated an internal email to have the Third Floor Wall repaired to allow flashing to be installed to prevent water incursion between the properties. Exhibit P-23. However, Mellon never repaired the Third Floor Wall and waited until January 2016 to repair the flashing, as explained *infra*.

In May 2015, Mr. Bencze stayed overnight at the Bencze Property and credibly testified that he became sick from what he believed to mold. NT 11/8/16 p. 61-62. He had itchy eyes and skin, a cough, wheezing and nausea. *Id*. It took three to four days for these symptoms to pass. *Id*.

An Order was issued on July 21, 2015 requiring the parties, within ten days, to arrange a time to access each property and to allow Mellon's contractor to evaluate and/or assess water damage and the cost of repairs. Exhibit Mellon-52. On August 20, 2015, a joint inspection of the properties took place. NT 19/28/16 p. 177; NT 11/15/16 p. 43. Present at the Joint Inspection were the Benczes, Mr. Voories, Gary Landis, an architect from ABD Construction, Mark Childs, a regional field service manager for Altisource, and

13

an Altisource vendor.  NT 9/28/16 p. 82; NT 11/15/16 p. 33-34.  Mr. Voories and Mr. Childs generated reports based on their inspections, both of which were admitted into evidence at trial with the exception of a portion of Mr. Voories' report.  Exhibits P-9 and Mellon-25, NT 9/28/16 p. 204.

As to the Bencze Property, only Mrs. Bencze and Mr. Voories went onto the Bencze Roof, and they observed the prior repairs.  NT 9/28/16 p. 82; 179, NT 11/5/16 p. 69, 71. Though granted access to do so, no one from Altisource inspected the Bencze Roof.  NT 9/28/16 p. 82; NT 11/5/16 p. 69.  Both Mr. Voories and Mr. Childs inspected the remainder of the Bencze Property's exterior.  NT 9/28/16 p. 203; NT 11/15/16 p. 43. At trial Mellon contended that some (or most) of the damage to the Bencze Property was due to an external downspout in the wall in the rear yard. Mr. Voories did not find the Bencze downspout was faulty.  NT 9/28/16 p. 197, 203.  Mr. Child's January 2016 report does not mention the Bencze downspout.  NT 11/15/16 p. 72; Exhibit Mellon-25.  Mr. Voories and Mr. Childs inspected the interior of the Bencze Property and both observed the water damage throughout.  NT 9/28/16 p. 177; NT 11/15/16 p. 43; Exhibit Mellon-25.  Mr. Voories traced the Bencze Property from the bottom up to determine the source of water. NT 9/28/16 p. 177, 184-185.  Mr. Voories also testified that he observed mold in the Bencze Property.  *Id.* at 19; Exhibit P-9.

As to the interior of the 2713 Property, Mr. Bencze was present during the inspection.  Mr. Bencze observed the repairs on the third floor, damage to the second floor Party Wall, first floor water damage to the wall adjacent to the Bencze Property, and water damage to the floors and ceilings.  NT 11/8/16 p. 48-49.

14

As a result of the Joint Inspection, Mr. Voories concluded the water was coming from the 2713 Property. NT 9/28/16 p. 181, 184-185. Specifically, he determined that due to the condition of the 2713 Property roof, water was coming behind the Third Floor Wall and into the Bencze Property. *Id.* Mr. Voories' opinions at trial were given based upon a reasonable degree of certainty as a result of his experience, knowledge, and expertise in construction. *Id.* at 175. While the report at Exhibit P-9 uses language such as "seems" and "most likely" to describe the 2713 Property as the source of water, the Court finds that the report was not created in anticipation of litigation and was not written as a legal document. NT 9/28/16 p. 186. The Court does not find the report to be inconsistent with Mr. Voories' testimony at trial.

Mr. Childs' report of the Joint Inspection concluded that he could not state with certainty that any of the damage to the Bencze Property occurred after the First Ejectment on January 31, 2014 or after the Second Ejectment on February 5, 2015, i.e., when Mellon had possession of the 2713 Property. NT 11/15/16 p. 40; Exhibit Mellon-25. Mr. Childs, however, failed to state whether or not the water damage to the Bencze Property was caused by water infiltration from the 2317 Property during any period when Mellon did not have possession of the 2317 Property, e.g., between Super Storm Sandy and January 31, 2014. Mr. Childs was also unfamiliar with the condition of the Bencze Property after the storm and prior to Altisource being hired in 2013. NT 11/15/16 p. 62-67.

Soon after the Joint Inspection, Mr. Voories inspected the interior and exterior of the Bencze Property for a third time. NT 9/28/16 p. 190. At all visits, Mr. Voories did a thorough inspection of the exterior of the Bencze Property to look for other conditions that

15

could have contributed to the damage, including the Bencze downspout. *Id.* at 203. Mr. Voories did not find that the Bencze Downspout was faulty. *Id.* at 197, 203.

On or around January 20 2016, Mellon repaired and replaced the roof to the 2713 Property. NT 11/15/16 p. 40; Exhibit Mellon-24. This was nearly a year after Mellon had possession of the 2713 Property in February 2015 and five months after the Joint Inspection.

In April 2016, Mr. Bencze installed foam at the base of the Bencze downspout. NT 11/8/16 p. 82. This was done to ensure that the Bencze downspout did not loosen from the drainpipe while the Benczes were away from the Bencze Property. *Id.* at 64. The Bencze downspout has never become loose from the drainage. *Id.*

Mr. Childs revisited both properties on three occasions. In late June, early July 2016, Mr. Childs stood on the 2713 Property's roof and looked down to observe the roof of the Bencze Property. NT 11/15/16 p. 46. Mr. Childs opined there was a tear in the Bencze Property roof, of which he took a photo. *Id.*; Exhibit Mellon-24; Exhibit P-21. However, Mr. Childs only observed the roof of the Bencze Property from the 2713 Property's roof and never inspected it. NT 11/15/16 p. at 46. There was also no mention of a tear in his previous January 2016 report. *Id.* at 72; Exhibit Mellon-25.

On July 22, 2016, Mr. Childs reinspected the inside and outside of the Bencze Property. Moisture readings were also taken at this time. NT 11/15/16 p. at 49, Exhibit Mellon-34. In early August 2016, he inspected the exterior of the Bencze Property and noted that the Bencze downspout appeared to be disconnected from the drainpipe. NT 11/15/16 p. 50. Mr. Childs' August 2016 report reflects his observation that the moisture

16

readings were greater around the area of the Bencze downspout.  *Id.* at 51; Exhibit Mellon-34.  Again, however, Mr. Childs never mentioned the Bencze downspout in his previous reports.  Exhibits Mellon-24 and 25.

Edward Pridgen, a civil and mechanical engineer, also inspected both properties.  He testified at trial and was qualified as an expert in construction.  NT 11/8/15 p. 106.  Mr. Pridgen's first visit was in the summer of 2015.  *Id.* at 107.  He inspected the roof of the 2713 Property and determined the cause of damage to the Bencze Property was the Third Floor Wall.  *Id.* at 108.  Capping and flashing were missing or in disrepair. He also contends that the 2713 Property roof needed to be replaced.  *Id.* at 108, 115-116.  Mr. Pridgen inspected the inside of the Bencze Property and observed the water damage throughout.  *Id.* at 114-115.  He prepared an initial cost estimate to repair the Bencze Property, which totaled $71,570.  *Id.* at 109-112, 115-118; Exhibit P-10.

Mr. Pridgen reinspected the properties in May 2016.  NT 11/8/16 p. 119.  As to the Bencze Property's roof, Mr. Pridgen reviewed Mr. Childs' photo of the alleged tear at Exhibit P-21, but saw nothing that caused concern.  *Id.* at 136.  His own inspection revealed no issues with the Bencze Property's roof.  *Id.*  On both visits, Mr. Pridgen viewed the Bencze downspout and found it was damaged but was installed correctly and intact.  *Id.* at 137, 162.  However, the roof of the 2713 Property had not been properly repaired in January 2016 and water still infiltrated the Bencze Property.  *Id.* at 123-125.  Mr. Pridgen prepared an updated report and cost estimate to repair the Bencze Property, which totaled $224,005.00.  *Id.* at 125-133; Exhibit P-11.  His opinions at trial were given based upon a reasonable degree of certainty given his experience and knowledge in the field of

17

construction. NT 11/8/16 p. 139. Mellon has not provided any cost estimate for repairs to the Bencze Property.

Mr. Bencze credibly testified that as of the time of trial, it is uncomfortable to be in his Property and one cannot be inside for more than a few minutes due to what he believes to be the presence of mold. NT 9/28/16 p. 82-83. Also, the casements around the windows that had been installed when they first purchased the Property, have popped out and cracked. The alleyway wall has cracked and peeled. *Id.* at 83, 88-89.

The Benczes' claim with Liberty is currently still open. NT 11/8/16 p. 6. Liberty's adjuster revisited the Bencze Property in late 2015 and early 2016 to observe additional damage since the 2012 visits. *Id.* at 10, 17, 21. The adjuster observed damage in the Master and Guest Bedrooms, Living Room, Dining Room, Kitchen ceiling and basement. *Id.* at 17. As a result, Liberty made two more payments in early 2016 totaling $14,164.82. *Id.* at 16; Exhibit Liberty-2. Overall, Liberty has paid the Benczes $22,489.58 for building and dwelling coverage, and $5,000.00 for mold coverage, for a total of $27,489.58.

## CONCLUSIONS

### *Mikal and Stephen Bencze v. Bank of New York Mellon et al*

The Benczes' claims against Mellon sound in Equity and Negligence. The equitable claims for Private Nuisance and Trespass request an order requiring Mellon to repair the 2713 Property's roof. The granting of equitable relief "depends not so much on the want of a common-law remedy, as upon its inadequacy and its exercise is a matter which often rests within the discretion of the court; in other words the court may take upon itself to

18

say whether the common-law remedy is, under all the circumstances and in view of the conduct of the parties, sufficient for the purpose of complete justice...." *Cohen v. Pelagatti*, 342 Pa. Super. 626, 634–35, 493 A.2d 767, 771 (1985) (citation omitted). Here, the Court concludes that Benczes' equitable relief is not warranted and declines to grant such relief.

The Benczes next set forth a claim for Negligence against Mellon. As to Mellon's ownership of the 2713 Property, "[a] sheriff's sale is made without warranty; the purchaser takes all the risk, and the rule of *caveat emptor* applies in all its force." *CSS Corp. v. Sheriff of Chester County*, 352 Pa. Super. 256, 259, 507 A.2d 870, 872 (1986). The purchaser at a sheriff's sale receives all the right, title, and interest in the property that the debtor mortgagor held, and such rights of the purchaser, who later completes settlement, become fixed when the property is knocked down to the highest bidder. *Id.* Further, the recording of a deed is not essential to its validity or the transition of the title. *Fiore v. Fiore*, 405 Pa. 303, 306, 174 A.2d 858, 859 (1961). Accordingly, Mellon owned the 2713 Property as of the date of Superstorm Sandy on October 29, 2012, despite the Mellon Deed not being recorded until October 31, 2012.

Next, Mellon as owner of the 2713 Property had a duty to use and maintain its land so as to not injure adjoining landowners. *McArthur v. Balas,* 402 Pa. 116, 122, 166 A.2d 640, 643 (1961). *See also McCarthy v. Ference,* 358 Pa. 485, 58 A.2d 49 (1948); *Barker v. Brown*, 236 Pa.Super. 75, 340 A.2d 566 (1975). An adjoining landowner may be held liable in damages for "harm caused by the disrepair of a structure or other artificial condition thereon, if the exercise of reasonable care by the possessor or by any person to

19

whom he entrusts the maintenance and repair thereof (a) would have disclosed the disrepair and the unreasonable risk involved therein, and (b) would have made it reasonably safe by repair or otherwise." Restatement (Second) Torts §365; *Barker, supra*. Disrepair includes "dilapidations caused by the usual forces of nature, by wear and tear, or by a sudden and previously unexpectable change caused by an unusual and unexpectable natural force...or negligent acts of the possessor...." Restatement (Second) Torts §365, Comment a. Further, the Pennsylvania Suggested Standard Civil Jury Instructions set forth the duty and resulting liability of an adjoining landowner, and states:

> One who [owns][occupies] land in a developed or residential area has a duty to make reasonable inspections of the property, and to correct any conditions unreasonably dangerous to others that could be discovered by use of reasonable care and that could be reasonably safe by repair or otherwise.
>
> Therefore, if you find that the location of the defendant's property was in a developed or residential area, and that the plaintiff was caused harm by a dangerous condition on the defendant's property, and that the defendant by using reasonable care could have discovered the defect and the risk arising from it and could have made it reasonably safe by repair or otherwise, you may find the defendant liable for the resulting damage.

Pa. SSJI (Civ), §18.110 (2014).

Mellon argues that it had no duty to maintain the 2713 Property when it was not in possession because a mortgagee cannot be liable in tort for failing to maintain a mortgaged property unless the lender had actual possession thereof. *See Zisman v. City of Duquesne*, 143 Pa. Super. 263, 18 A.2d 95, (1941). However, the Court finds that *Zisman* and the other cases cited by Mellon are distinguishable. In *Zisman*, the bank was still the mortgagee and did not own the property at issue. Though the mortgagor was in default, the mortgagor still owned the property. The bank had never commenced a foreclosure action and the property never went to sheriff sale. Here Mellon filed a

20

foreclosure action, judgment was entered, and the 2713 Property was sold to Mellon at sheriff's sale. Although Mellon and the Butterlines previously held a mortgagee/mortgagor relationship based on the note and mortgage, once the foreclosure judgment was entered, "the parties' mortgage agreement was extinguished." *EMC Mortg., LLC v. Biddle*, 114 A.3d 1057, 1064 (Pa. Super. Ct. 2015); *see also id.* at 1065 (explaining that, under the doctrine of merger of judgments, upon entry of a foreclosure judgment, "the terms of [the] mortgage are merged into a foreclosure judgment and thereafter no longer provide the basis for determining the obligations of the parties" (quoting *In re Stendardo*, 991 F.2d 1089, 1095 (3d Cir. 1993) Accordingly, Mellon was no longer the mortgagee or lender after the entry of judgment because the mortgage and the foreclosure judgment had merged. Mellon became the lawful owner at the November 2011 Sheriff's Sale and the "mortgagee out of possession" standard does not apply. The "landlord out of possession" standard is also inapplicable, in that there was no contractual relationship between Mellon and the Butterlines once title passed to Mellon. Throughout litigation, Mellon has treated this action as a mortgage foreclosure case wherein Mellon would still be mortgagee and need possession in order to maintain and repair the 2713 Property. However, at all relevant times Mellon has been the owner of the 2713 Property, not mortgagee, and has had the duty and responsibility to use reasonable care in maintaining the 2713 Property whether it was in or out of possession thereof. Further, as the owner of the 2713 Property Mellon took no action to remediate or cure those problems that were causing the damage to the Bencze property. Instead Mellon took the position that it had no responsibility because it wasn't in possession. Mellon made no attempt to work with the Benczes to gain access to the Benczes' roof, the 2713 Third Floor Wall, nor the damaged flashing. All

21

of which could be accessible from the Benczes' Property by climbing on a ladder from the front or rear to the second story roof. Mellon made no contact with the Butterlines to gain access to the 2713 Property roof and make repairs. Instead, Mellon contends that it is the company policy to not go to a foreclosed property until it has possession. Mellon continued to act as though its only concern was the mortgaged property, not as the owner but as the mortgagee. That would be fine but for the fact that its decision resulted in damage to the adjacent property. Mellon never sought relief from the court for access to the 2713 Property or the Bencze Property to make the repairs.

Accordingly, Mellon breached its duty and is negligent for failing to maintain and repair the 2713 Property so as to prevent continuous water infiltration to the Bencze Property. As indicated above, Mellon had notice of the damage to the 2713 Property and Bencze Property soon after Superstorm Sandy. Mellon never repaired or attempted to repair the Third Floor Wall or the flashing attached thereto. Mellon also failed to sufficiently repair the 2713 Property's roof.

Furthermore, the overwhelming evidence submitted at trial shows that the condition of the 2713 Property caused the water infiltration in the Bencze Property and the resulting damage. The Benczes credibly testified that they had no issues with water infiltration prior to the collapse of the Third Floor Wall. However, after the storm and resulting collapse, water infiltrated the west side of the Bencze Property under the exposed Third Floor Wall and substantial water and mold damage resulted, which continued to spread throughout. The Benczes also credibly testified that the flooding in the basement of the Bencze Property happened at the time the 2713 Property flooded. Although Mellon now

22

claims that most, some, or all of the water damage to the Bencze home is from the allegedly defective downspout, this court finds that Mellon has failed to establish that tthis was the cause of the extensive damage to the Benze property. Mellon's failure to maintain and repair the 2713 Property was the factual cause of the Benczes' property damage and financial loss.

As the Benczes have proven their claim for Negligence, the Benczes are entitled to the resulting damages. The damages are calculated as follows[6]:

| | |
|---|---|
| Deductible: | $ 1,000.00 |
| Mold testing: | $ 825.00 |
| Stucco and roof repair: | $ 8,000.00 |
| Mold remediation: | $ 10,000.00 |
| Rent and fees: | $ 40,281.60 |
| Travel expenses: | $ 3,000.00 |
| Storage fees: | $ 2,026.46 |
| Furniture replacement: | $ 12,361.00 |
| PECO energy: | $ 2,650.56 |
| Winterization: | $ 350.00 |
| Credit card interest: | $ 3,502.64 |
| Property remediation: | $152,528.50[7] |
| **Total damages:** | **$236,525.76** |

---

[6] The Court declines to award damages for the Comcast internet fees, and security system fees. There is no credit card interest associated with these fees.

[7] The Court declines to award remediation damages for the cost of mold remediation and removal, kitchen/bath replacement and plumbing as set forth in Exhibit P-11. The percentaged fees on the fifth page of Exhibit P-11 have been reduced accordingly. The Court also declines to award damages for the packing/moving/storage cost allowance. *See id.*

23

## _Liberty Mutual Ins. Co. A/S/O Bencze et al v. Bank of New York Mellon_

Liberty seeks equitable and contractual subrogation from Mellon for payments made to the Benczes as a result of Mellon's failure to make necessary repairs to the 2713 Property. Subrogation involves the right of legal substitution which is granted " 'as a means of placing the ultimate burden of a debt upon the one who in good conscience ought to pay it, and is generally applicable when one pays out of his own funds a debt or obligation that is primarily payable from the funds of another.' " _Panea v. Isdaner_, 2001 Pa. Super. 108, ¶16, 773 A.2d 782, 791 (2001).

Here, Liberty issued payments to the Benczes totaling $27,489.58. As Mellon is responsible for failing to make timely repairs to the 2713 Property so as to prevent damage to the Bencze Property, Liberty is entitled to subrogate against Mellon in the amount of $27,489.58.

## _Bank of New York Mellon v. Mark and Lisa Butterline_

Mellon's action against the Butterlines requests money damages for Trespass and Contribution. As to the claim for Trespass, under Pennsylvania law, a trespass is defined as an unprivileged, intentional intrusion upon land in possession of another. _Kopka v. Bell Telephone Co._, 371 Pa. 444, 91 A.2d 232 (1952).

A possessor of land can seek damages in the form of equitable relief or consequential damages. _Jones v. Wagner_, 425 Pa. Super. 102, 112 (1993). "'A trespasser on land is subject to liability for harm caused to the possessor...by any ...condition created by the trespasser while upon the land.'" _Kopka_ at 451, 236.

24

Here, the Butterlines intentionally reoccupied the 2713 Property between September 2014 and Second Ejectment. The Butterlines therefore trespassed during this period. Mellon had already exercised its right to equitable relief when it ejected the Butterlines. However, as to consequential damages Mellon failed to produce any competent evidence of monetary damage resulting from the trespass. There is no evidence that the Butterlines caused any damage to the 2713 Property or Bencze Property during their occupancy, including the flood which occurred before the Butterlines reentered. In fact, the evidence shows that the Butterlines attempted to repair the 2713 Property and make it more habitable. Mellon also offered no evidence as to what apportioned damage occurred while the Butterlines occupied the 2713 Property or the resulting monetary amount. Accordingly, the Court is unable to award any damages for the trespass. The damage caused to the Bencze Property was due to Mellon's negligence in failing to maintain and repair Mellon's property.

Lastly, Mellon seeks contribution from the Butterlines. A contribution claim is defined as "[a] defendant's claim to recover part of his or her liability to a plaintiff from another defendant or some third party who, it is asserted, should share in the liability." Black's Law Dictionary (10th ed. 2014). In Pennsylvania, contribution claims are only authorized amongst joint tortfeasors. *Kemper Nat'l P & C Companies v. Smith*, 419 Pa. Super. 295, 309, 615 A.2d 372, 380 (1992). Here, the Butterlines and Mellon were not named as joint tortfeasors, and as set forth above, the Butterlines are not responsible for damages in trespass. Therefore, Mellon cannot be awarded damages for Contribution.

25

## ORDER

**AND NOW**, this _~~3~~_ day of May, 2017, for the reasons set forth above, this Court finds as follows:

- In the matter of _Bencze v. Bank of New York Mellon_ (October Term 2014 No. 3255)the Court finds in favor of Plaintiffs Mikal and Stephen Bencze and against Defendant Bank of New York Mellon for Negligence in the amount of $236,525.76.

- In the matter of _Liberty Mutual v. Bank of New York Mellon_ (October Term No. 1662) the Court finds in favor of Plaintiff Liberty Mutual Insurance Company, as Subrogee of Mikal and Stephen Bencze, and against Defendant Bank of New York Mellon in the amount of $27,489.58.

- In the matter of _Bank of New York Mellon v. Butterline_ (September Term 2015 No. 1529) the Court finds in favor of Plaintiff Bank of New York Mellon and against Defendants Lisa and Mark Butterline for Trespass but awards no damages, and finds against Plaintiff Bank New York Mellon and in favor of Defendants Lisa and Mark Butterline in the claim for Contribution.

BY THE COURT:

_____

**IDEE C. FOX, J.**

26

# EXHIBIT B

IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE. CO. A/S/O MIKAL AND STEPHEN BENCZE | : | OCTOBER TERM, 2014 |
| | : | NO. 1662 |
| v. | : | |
| | : | LEAD CASE |
| THE BANK OF NEW YORK MELLON CORP | : | |
| | : | CONTROL NO. 17051754 & 17060288 |
| MIKAL AND STEPHEN BENCZE | : | OCTOBER TERM, 2014 |
| | : | |
| v. | : | NO. 3255 |
| | : | |
| LIBERTY MUTUAL INSURANCE CO. and THE BANK OF NEW YORK MELLON | : | CONTROL NO. 17051755 & 17051734 |
| BANK OF NEW YORK MELLON CO., N.A | : | SEPTEMBER TERM, 2015 |
| | : | |
| v. | : | NO. 1529 |
| | : | |
| MARK AND LISA BUTTERLINE | : | CONTROL NO. 17051756 |

## ORDER

**AND NOW**, this  *11*  day of August, 2017, upon consideration of the

Motion for Post Trial relief filed by Bank of New York Mellon, and any response thereto,

for the reasons set forth in the attached Opinion, the Motion is **DENIED.**

It is further ordered that the Motion for Delay Damages filed by Mikal and

Stephen Bencze is **GRANTED** and they are awarded delay damages of $15,586.40 for

total award of $252,112.16 in favor of Mikal and Stephen Bencze and against Bank of

New York Mellon. The Motion for Delay Damages filed by Liberty Mutual Insurance

Liberty Mutual Insurance Co Vs Bank Of Ny/M-ORDER



14100166200137

Company is **DENIED**. Liberty Mutual as Subrogee of Mikal and Stephen Bencze is awarded $27,489.58.

Judgment is entered.

BY THE COURT:

_____
**IDEE C. FOX, J.**

# IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE. CO. A/S/O MIKAL AND STEPHEN BENCZE | : : | OCTOBER TERM, 2014 |
| | : | NO. 1662 |
| v. | : : | LEAD CASE |
| THE BANK OF NEW YORK MELLON CORP | : : | CONTROL NO. 17051754 |
| | : | & 17060288 |
| MIKAL AND STEPHEN BENCZE | : : | OCTOBER TERM, 2014 |
| v. | : : | NO. 3255 |
| LIBERTY MUTAL INSTURANCE CO. and THE BANK OF NEW YORK MELLON | : : | CONTROL NO. 17051755 & 17051734 |
| BANK OF NEW YORK MELLON CO., N.A | : : | SEPTEMBER TERM, 2015 |
| v. | : : | NO. 1529 |
| MARK AND LISA BUTTERLINE | : | CONTROL NO. 17051756 |

## OPINON

The above captioned matters were consolidated for trial. After a bench trial this Court entered an Order finding against The Bank of New York Mellon (Mellon) and awarding damages in the amount of $236,525.76. The Court issued detailed Findings with its Decision. Mellon timely filed a Motion for post trial relief, raising five issues. For the reasons set forth below, the Motion is denied.

## FACTUAL AND PROCEDURAL SUMMARY

This consolidated action concerns property damage and untimely repairs to the home of Stephen and Mikal Bencze located at 2715 E. Huntingdon Street in Philadelphia ("Bencze Property"). The damage initially occurred after the wall of the adjacent property, 2713 E. Huntingdon Street ("2713 Property") partially collapsed and fell onto the roof of the Bencze Property during Superstorm Sandy. After additional damages were incurred, the Benczes filed suit against Bank of New York Mellon ("Mellon"), the owner of the 2713 Property, seeking equitable and monetary relief. The Benczes also sued their homeowner's insurance carrier, Liberty Mutual Insurance Company ("Liberty"), for breach of contract. Subsequent actions were filed by Liberty against Mellon, for subrogation, and by Mellon against the previous owners of the 2713 Property, Mark and Lisa Butterline ("Butterlines"), for contribution and trespass. The three cases were consolidated.

After a bench trial this Court issued its decision with an Opinion that contained detailed Findings. This Court found as follows:

- In the matter of *Bencze v. Bank of New York Mellon* (October Term 2014 No. 3255) the Court finds in favor of Plaintiffs Mikal and Stephen Bencze and against Defendant Bank of New York Mellon for Negligence in the amount of $236,525.76.

- In the matter of *Liberty Mutual v. Bank of New York Mellon* (October Term No. 1662) the Court finds in favor of Plaintiff Liberty Mutual Insurance

Company, as Subrogee of Mikal and Stephen Bencze, and against Defendant Bank of New York Mellon in the amount of $27,489.58.

- In the matter of *Bank of New York Mellon v. Butterline* (September Term 2015 No. 1529) the Court finds in favor of Plaintiff Bank of New York Mellon and against Defendants Lisa and Mark Butterline for Trespass but awards no damages, and finds against Plaintiff Bank New York Mellon and in favor of Defendants Lisa and Mark Butterline in the claim for Contribution.

Mellon promptly filed this Motion for Post Trial relief. This Court adopts the Findings contained in its decision

Additionally, the Benczes and Liberty Mutual both filed Motions for Delay Damages. The Benczes Motion for Delay Damages was filed promptly, while Liberty Mutual's Motion was filed thirty days after this Court's Finding and Decision was docketed. The Benczes seek delay damages of $15,586.40 against Mellon, in addition to the initial verdict of $236,525.76. Liberty Mutual seeks delay damages of $1,907.51 in addition to the initial verdict of $27,489.58. Mellon filed Responses to both Motions, along with a New Matter arguing Liberty Mutual's Motion is barred due to untimeliness. Liberty Mutual filed a Response to that New Matter. For the reasons set forth below, the Court awards delay damages to the Benczes in the amount sought, and declines to award any delay damages to Liberty Mutual.

## DISCUSSION

The Motion for Post-Trial relief alleges that in regard to the Bencze's negligence claim and Liberty Mutual's subrogation claim, the Court erred for the following reasons: I. Finding Mellon "became legally responsible for the condition of the [2713 Property] before [Mellon] obtained actual possession"; II. "Refusing to qualify [Mellon's witness] Mark Childs as an expert"; II. "Finding that the Benczes had proven their damages by a preponderance of the evidence"; and IV. "[G]iving improper weight to the Bencze's purported evidence of water damage." In regard to Mellon's case against the Butterlines, Mellon contends that the Court erred in declining to award damages to Mellon in its trespass and contribution claims.

I. **BNYM IS ENTRY OF JUDGMENT/JNOV IN ITS FAVOR OR, IN THE ALTERNATIVE, BNYM IS ENTITLED TO A NEW TRIAL, BECAUSE THE COURT ERRED IN FINDING THAT BNYM BECAME LEGALLY RESPONSIBLE FOR THE CONDITION OF THE BUTTERLINE PROPERTY BEFORE BNYM OBTAINED ACTUAL POSSESSION.**

Mellon became owner of the 2713 Property by virtue of a foreclosure action filed by Mellon against the Butterlines. Pursuant to that foreclosure action, the 2713 Property was sold at Sheriff's Sale, where Mellon was the sole bidder. The Deed transferring the Property to Mellon was executed before Superstorm Sandy, but not recorded until two days afterward. Mellon argues that it is not liable for the condition of the Property prior to the recording of the Deed.

The purchaser at a sheriff's sale receives all the right, title, and interest in the property that the debtor mortgagor held, and such rights of the purchaser, who later completes settlement, become fixed when the property is knocked down to the highest bidder. *CSS Corp. v. Sheriff of Chester County*, 352 Pa. Super. 256, 259, 507 A.2d 870, 872 (1986). Further, the recording of a deed Is not essential to its validity or transition of the title of property. *Fiore v. Fiore*, 405 Pa. 303, 306, 174 A.2d 858. 859 (1961). As such, Mellon inherited the duty to maintain the 2713 Property when the Sheriff's Sale concluded, not when the Deed was recorded.

Alternatively, Mellon argues it cannot be liable for the condition of the Property prior to Mellon receiving "actual possession" of the 2713 Property, which was occupied by the Butterlines at the time of Superstorm Sandy and for a significant time afterward. Mellon did not obtain "actual possession" of the 2713 Property until after ejectment proceedings were filed by Mellon against the Butterlines. Mellon contends that "a lender cannot be liable to third persons in tort for failure to properly maintain the mortgaged premises unless the lender had actual control and possession of the property." *Welz v. Wong*, 605 A.2d 368, 372 (Pa. Super. 1992). However, once Mellon purchased the 2713 Property at Sheriff Sale, Mellon ceased to be the mere lender/mortgagee of the Property and instead became its owner. There is an inherent duty placed upon landowners to maintain their land so as not to injure adjoining landowners. *Baker v. Brown*, 236 Pa. Super. 73, 340, A.2d 566 (1975). As such, Mellon was responsible for maintaining the 2713 Property regardless of whether Mellon was in "actual possession."

Similarly, Mellon argues the Court cannot assess liability on Mellon for the condition of the Property because of the December 23, 2014 Order issued by the Honorable Nina Wright-Padilla pursuant to the Bencze's Petition for Injunctive Relief. The Order states "the Sheriff of Philadelphia County to deliver actual possession of the [2713 Property] to [Mellon] using force if necessary" and "within ten (10) days of actual possession...Mellon shall retain a contractor to commence work to correct any and all violations issued by the City of Philadelphia and repair and maintain the [2713 Property] in such a way as to prevent damage to Plaintiff's property." Mellon therefore argues that this Court's Findings and Decision violates the rule of coordinate jurisdiction, because Judge Padilla "determined that [Mellon's] obligation to make repairs commenced upon its receipt of actual possession of the [2713 Property]." The rule of coordinate jurisdiction mandates that "judges of coordinate jurisdiction sitting in the same case should not overrule each other's decisions on the same issue." *In re De Facto Condemnation & Taking of Lands of WFB Associates, L.P.*, 588 Pa. 242, 268 (2006). Here, the Bencze's Petition for Injunctive Relief was filed against Mellon, years after the initial damage to their Property. Judge Padilla's Order did not limit Mellon's liability. Instead, Judge Wright-Padilla's Order was a means of enforcement, meant to ensure that Mellon, as owner of the 2713 Property, would comply with its pre-existing obligations and prevent further damage to the Bencze Property. As such, this Court's decision to find Mellon liable for failing to maintain the 2713 Property from the time of the Sheriff's Sale was not a violation of the coordinate jurisdiction rule. Mellon has argued throughout this case that it cannot be held responsible because it was the

mortgagee and not in possession of the Property which caused the damage. Mellon owned the property. Its relationship to the Benczes was as an adjoining property owner with a duty to not do damage to their neighbor. The mortgagor/mortgagee relationship that had existed was between the Buttelerlines and Mellon. The Benczes were entitled to be safe and secure from the negligent behavior of the adjacent property owner. Mellon was the owner when title was transferred to it. In addition Mellon neglects this Court's finding that the repairs necessary to prevent damage and continued damage to the Bencze property could have been done without possession. Further, after the Butterlines moved from the property, Mellon did not secure and/or maintain the property. Mellon saw itself as a mortgage holder and not a property owner. That was not their relationship with the Benczes.

## II. BNYM IS ENTITLED TO A NEW TRIAL BECAUSE THE COURT ERRED IN REFUSING TO QUALIFY MARK CHILDS AS AN EXPERT WITNESS.

At trial Mellon requested that witness Mark Childs be qualified as expert in property preservation. The opposing parties did not object, but this Court only allowed Childs to testify as a fact witness and not an expert witness. Mellon now argues that Childs' expert testimony was improperly barred, "seemingly because" Childs was employed by a company that has a relationship with Mellon.

The power to determine whether a witness has been properly qualified to give expert testimony is vested in the discretion of the trial court. *West Philadelphia Therapy Center v. Erie Ins. Group*, 2000 PA Super 94, 751 A.2d 1166, 1167 (Pa.Super. 2000).

This Court did not qualify Mark Childs as an expert witness because the Court found his purported expert testimony was really an attempt to offer evidence it deemed hearsay because it was the opinion of a separate inspector's findings/non findings regarding mold. Specifically, Mr. Childs was asked to read portions of a report pertaining to mold, prepared by not Mr. Childs but a certified mold remediation company Armato Field Services and an independent laboratory EMLab P&K. This Court found the field of mold remediation to be distinct from Mr. Child's professed expertise, property preservation, and thus the Court properly excluded Mr. Child's testimony on the subject. Further, the Court offered Mellon an opportunity to return the next day with the representative from Armato Field Services. Mellon declined.

### III.   BNYM IS ENTITLED TO JUDGMENT IN ITS FAVOR ON THE BENCZES' NEGLIGENCE CLAIM AND LIBERTY MUTUAL'S SUBROGATION CLAIM BECAUSE THE COURT ERRED IN FINDING THAT THE BENCZES HAD PROVEB THEIR DAMAGES BY A PREPONDERANCE OF THE EVIDENCE.

Mellon argues that this Court erred in its credibility determination of the witnesses presented by Plaintiff to prove damages. Specifically, Mellon contends that the Court erred in relying on the testimony of Edward Pridgen, whose repair estimates tripled between his initial inspection and a subsequent inspection. As this was a bench trial, the Court acted as the fact finder. It is the fact-finder, and only the fact-finder, that may determine credibility. See *Commonwealth v. Blackham*, 909 A.2d 315, 320 (Pa.Super. 2006), appeal denied, 919 A.2d 954 (Pa.2007).

As noted in the Court's Findings and Decision, the Court found the testimony of Mr. Pridgen (a civil and mechanical engineer) and his assessment of damages credible. With regard to the large increase in his estimate, Mr. Pridgen testified that during his initial visit he was not aware that the water infiltration had been taking place for years. NT 11/8/15 p. 113-114. Upon learning this fact, Mr. Pridgen revisited the Property because he believed the mold problem was likely to be far more pervasive than he previously thought. The updated June 2016 estimate reflects Mr. Pridgen's opinion that "water infiltration for that period of time" would result in "the growth of mold throughout that entire house". *Id.* at 125. As the Court found Mr. Pridgen's reason for increasing the estimate credible, the Court did not err in relying on Mr. Pridgen testimony in assessing damages.

In the alternative, Mellon argues that the damages awarded by the Court are improper because damages for injury to property may not exceed the value of the property. *Wade v. S.J. Groves & Sons Co.*, 424 A.2d 902 (Pa. Super. 1981). Mellon argues that the Benczes were awarded $160,528.50 for property remediation and stucco/roof repairs when the value of the Bencze Property at the time of purchase was only $155,000.00. However, as noted in the Court's Findings and Decision, $8,000.00 of the Court's award represented the cost of repairs to the wall of the 2713 Property (repairs which Mellon did not make, despite a legal responsibility) paid for by the Benczes to prevent further damage to their home. As a result, the Court did not err in the amount of damages in awarded. Also, the Benczes' purchase price isn't market

value. Husband and Wife both testified as to the work they had done on the house after purchase.

**IV.    The BNYM IS ENTITLED TO JUDGMENT IN ITS FAVOR ON THE BENCZES' NEGLIGENCE CLAIM AND LIBERTY MUTUAL'S SUBROGATION CLAIM BECAUSE THE COURT ERRED IN ITS ASSESSMENT OF THE EVIDENCE RELATED TO WATER DAMAGE.**

Mellon argues that the only credible evidence regarding the cause of water damage to the Bencze Property was provided by Mark Childs and his conclusion that the water damage originated from a faulty downspout installed by the Benczes. Again, the case at hand was a non-jury trial wherein this Court acted as the fact finder. Only the fact-finder may determine credibility. See *Commonwealth v. Blackham*, supra. Here, the Court found that the Benczes, Dirk Voories (an individual with experience, knowledge, and expertise in construction) and Mr. Pridgen credibly testified that there were no issues with water infiltration at the Bencze's home prior to Superstorm Sandy and the later basement flood of the 2713 Property. This Court also heard evidence to suggest that water infiltrated the west side of the Bencze Property, which is under the 2713 Property's exposed third floor wall, which resulted in substantial water and mold damage. The inspection by Mark Childs occurred years after Superstorm Sandy and the later 2713 Property flood.

Mellon argued at trial that the water damage was caused by the Benczes themselves, but failed to present sufficient evidence to support this. The Court found that Mr. Childs failed to directly state whether or not the water damage to the Bencze

property was caused by water infiltration from Mellon's property. Instead Mr. Childs merely noted that the Bencze's downspout was disconnected from the pipe. The representative from Altisource concluded that the downspout "could" be a source of water intrusion but did not testify directly that it was the cause of damages to the Bencze's Property. Accordingly, the Court's assessment of the evidence was not in error.

## V.    BNYM IS ENTITLED TO AN AWARD OF DAMAGES IN ITS FAVOR ON ITS TRESPASS CLAIM AGAINST THE BUTTERLINES OR BECAUSE THE COURT ERRED IN FINDING THAT BNYM WAS NOT ENTITLED TO SUCH DAMAGES.

Mellon contends that it is entitled to "damages resulting from the Butterline's "trespass", including but not limited to the costs to repair the damage to the Bencze Property." Alternatively, Mellon contends "at the very least, the Butterlines owe contribution to BNYM as joint tortfeasors." Generally, "a trespasser on land is subject to liability for harm caused to the possessor by any condition created by the trespasser while upon the land." *Kopka v. Bell Telephone Co.*, 371 Pa. 444, 91 A.2d 232 (1952). Joint tortfeasor "means two or more persons jointly or severally liable in tort for the same injury to persons or property." 42 Pa.C.S.A. §8322.

Here, it is undisputed that the Butterlines occupied the 2713 Property for some time after the Sheriff's Sale, after ownership transferred to Mellon and without Mellon's permission. However no evidence was presented, by Mellon or any other party, that the Butterlines caused harm or injury to the Bencze Property. The damage was caused

by the failure to repair after the wall collapsed and a later flood after the Butterlines moved out. Mellon claims that actual possession was necessary to make repairs to the 2713 Property. However, Mellon presented no evidence that the Butterlines prevented access. Further the flood at the 2713 Property was during a time that the Butterlines were not in possession of the property. Without specific proof that the Butterlines created harmful conditions during their trespass or contributed to the negligent maintenance of the 2713 Property, the Court did not err in finding against Mellon in its claim against the Butterlines.

### Delay Damages

Mellon does not dispute the calculation of the delay damages sought by the Benczes and Liberty Mutual. Instead, Mellon argues that delay damages are not warranted because Mellon is not liable for any property damage. Additionally, with regard to Liberty Mutual, Mellon argues that no delay damages should be awarded because Liberty Mutual were untimely in its filing. Pa.R.C.P. 238(c) requires a Motion for Delay Damages be filed within ten days of the verdict or notice of decision. Liberty Mutual argues that its delay in filing the Motion for Delay Damages does not prejudice Mellon, and should therefore be excused.

The Benczes are entitled to delay damages. In regard to Liberty Mutual's Motion for Delay Damages, the Court finds that Liberty Mutual's Motion should be denied as untimely for failing to comply Pa.R.C.P. 238(c), regardless of whether there is prejudice

to Mellon. See *Brocklehurst v. Watson*, 597 A.2d 631, 409 Pa.Super. 1, (Pa.Super. 2001), appeal denied 612 A.2d 983, 431 Pa. 644; see also *Dougherty v. Edward J. Meloney, Inc.*, 661 A.2d 375, 661 A.3d 375 (Pa.Super. 1994), holding "a motion for Rule 238 damages must be filed timely since a Rule 238 motion is an affirmative request for assessment of damages and since Rule 238 is designed as a punishment for non-settling litigants." As such, the Court awards delay damages to the Benczes in the amount sought and declines to award any delay damages to Liberty Mutual.

BY THE COURT:

_____
**IDEE C. FOX, J.**

**Date:** _____